FILED
04 SEP 30 PM 1:31
U.S. ...
N D ...

ENTERED
SEP 3 0 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED MINE WORKERS OF AMERICA, LOCAL 2133; UNITED MINE WORKERS OF AMERICA, INTERNATIONAL UNION,** } } } } } } | |
| Plaintiffs, } } | |
| vs. } } | CASE NO. CV-03-B-0126-S |
| **U.S. STEEL MINING COMPANY, LLC,** } } } } | |
| Defendant. } | |

## MEMORANDUM OPINION

Currently before the court are cross Motions for Summary Judgment filed by Plaintiffs and Defendant. Plaintiffs United Mine Workers of America, Local 2133 ("Local 2133"), and United Mine Workers of America, International Union ("UMWA") request that the court vacate an arbitrator's decision in favor of defendant U.S. Steel Mining Company, LLC ("USM"). (Doc. 13 ¶ 11.) USM requests that the arbitration award be upheld. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that plaintiffs' Motion for Summary Judgment is due to be denied and defendant's Motion for Summary Judgment is due to be granted.

25

## I. **FACTUAL SUMMARY**

At all times relevant to these facts,[1] USM operated a mine in Jefferson County, Alabama known as the Oak Grove Mine ("the Mine"). (Doc. 21 ¶¶ 3-4.) Plaintiffs were then "the exclusive bargaining representatives of non-supervisory USM employees at the Oak Grove Mine." (*Id.* ¶ 7.) For those employees, Local 2133 was the local union of the UMWA, whose principal office is in Virginia. (*Id.* ¶¶ 5-6.) Over the years, the unions and USM had entered into a series of collective bargaining agreements, referred to as Wage Agreements; the parties stipulate for purposes of this litigation that they were bound by the 2002 Wage Agreement. (*Id.* ¶¶ 10-11.)

The Mine usually operated three shifts a day: the Day Shift, from 7:00 a.m. until 3:00 p.m.; the Evening Shift, from 3:00 p.m. until 11:00 p.m; and the Owl Shift, from 11:00 p.m. until 7:00 a.m. the next morning. (*Id.* ¶¶ 13-14.) On the morning of Thursday, June 20, 2002, at the end of the Wednesday Owl Shift, two employees covered by the 2002 Wage Agreement were disciplined by USM. (*Id.* ¶ 15.) Both employees protested their discipline. (*Id.*) At 11:00 p.m. on June 20, the Friday Owl Shift began, but with a problem – approximately fifty-one of the sixty-seven employees who were supposed to be at work failed to show up. (*Id.* ¶ 16.) On the Friday Day Shift immediately following this apparent strike, approximately eight out of sixty-seven employees failed and/or refused to show up for work, some without notice and without excuse. (*Id.* ¶ 19.)

---

[1] Unless otherwise indicated the relevant time is June 2002. (Doc. 21 n.1.)

2

On the morning of Friday, June 21, Local 2133 held a union meeting pursuant to its customary practice of convening a union meeting the morning after an unauthorized work stoppage. (*Id.* ¶ 18.) Rex Tanner, who worked at the Mine and was then president of Local 2133, (*Id.* ¶¶ 4, 8), conducted that meeting, (*Id.* ¶ 18). Tanner was originally a plaintiff in this case. (Doc. 12.) He usually worked the Evening Shift and had done so on June 20, immediately before the apparent strike. (*Id.* ¶ 17.) The parties agree that, at the meeting on the 21st, "Tanner directed [the Mine] employees to return to work, but the parties dispute particulars about that communication." (*Id.* ¶ 18.) On the first shift after that meeting, the Friday Evening Shift, approximately sixty of the seventy-three employees scheduled to work did not come to work. (*Id.* ¶ 20.) One of the employees who skipped work was Tanner. (*Id.* ¶ 21.) On June 26, 2002, USM gave a two-day suspension to approximately 140 of the employees who did not work on June 21st. However, four USM employees, including Tanner and three other members of Local 2133's Mine Committee, were suspended "with intent to discharge, on the grounds that they had "supported, condoned, authorized and participated in an unauthorized work stoppage."[2] (*Id.* ¶ 23; *id.* Ex. 2.)

---

[2]The parties' Joint Stipulation of Facts, from which many of these facts are taken, states that the suspensions were for "instigating and participating in a strike." (Doc. 21 ¶ 23.) However, the suspensions in evidence that this quotation is cited to do not contain this exact phrase. (*Id.* at Ex. 2.) They state in part, "you are being suspended with intent to discharge for your actions and activities . . . on June 21, 2002. On that date, you supported, condoned, authorized and participated in an unauthorized work stoppage. . ." *Id.*

Pursuant to the Grievance and Arbitration Procedures of the 2002 Wage Agreement, a meeting was held and USM converted all four suspensions with intent to discharge into actual discharges. (*Id.* ¶ 24.) Local 2133 then initiated a grievance on behalf of Tanner and the three other members of the Mine Committee. (*Id.* ¶ 25.) The grievances of the other three members were resolved by the parties and they returned to work, without back pay. (*Id.* ¶ 26.) However, the parties were unable to resolve Tanner's grievance, which the union then referred to arbitration. (*Id.* ¶ 27.) An arbitration hearing was held on October 21, 2002, and on January 7, 2003, the arbitrator issued a decision and award upholding Tanner's suspension and termination by USM. (*Id.* ¶¶ 28-29.) The arbitrator based that decision on circumstantial evidence which he believed showed that Tanner had been active in the work stoppage and afterwards untruthful about his actions. (Doc. 24, Ex. 2, ex. 6, at 14-16.)

Plaintiffs now move this court to vacate the arbitrator's decision chiefly on the ground that it violated public policy. (Mem. in Supp. of the Mot. for Summ. J. of Pls. United Mine Workers of America ("Pls.' Br.") at 7-13; Pls.' Reply to Def.'s Mot. for Summ. J. at 3-7.) Defendant argues that a court should very rarely overrule an arbitrator's decision and also that this particular decision should not be overruled. (Def. U.S. Steel Mining Company, LLC's Br. in Supp. of its Mot. for Summ. J. ("Def.'s Br.") at 13-17.) The court agrees with defendant's arguments.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this instance, although there are disagreements about the underlying facts of the case, the arbitrator has decided those, and the only remaining issue is whether his decision should be vacated under the applicable standard of review. This question is a legal one, and therefore appropriate for summary judgment for one party or the other.

### B. Vacation of an Arbitrator's Decision and Award

In reviewing the decision of an arbitrator, this court has a limited role. *See United Steelworkers of Am. v. American Mfg. Co*, 363 U.S. 564, 567-68 (1960); *Delta Air Lines, Inc. v. Air Line Pilots Assoc., Int'l*, 861 F. 2d 665, 669-70 (11th Cir. 1988). The Supreme Court described the standard for review of an arbitrator's decision in detail in *United Steelworkers*:

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.
>
> The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.

5

363 U.S. at 567-568 (footnote omitted). It follows that a court may not review the merits of an arbitrator's decision even if a party alleges that the arbitrator based his decision on incorrect facts. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987). The Eleventh Circuit has further described the standard:

> An arbitrator's result may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet, it may not be subject to court interference. The offending arbitrator's award which properly results in our setting it aside must be so offensive that one is to be seen only rarely.

*Delta Air Lines*, 861 F.2d at 670.

Clearly, the standard of review that this court applies in considering requests to vacate arbitration awards is a narrow one. To uphold the arbitrator's decision, the court must make the very minimal findings that the decision is rational, does not "exceed[] the scope of the arbitrator's authority," and does not "fail[] to draw its essence from the collective bargaining agreement." *IMC-Agrico Co. v. Int'l Chem. Workers Council*, 171 F.3d 1322, 1325 (11th Cir. 1999) (quotations omitted). Even if the court believes that the result is unmistakably wrong, the court should not substitute its judgment for that of the arbitrator. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers*, 484 U.S. at 38.

However, as plaintiffs in this case argue, there is a potentially relevant exception to this deference to arbitration: the court must vacate an arbitrator's decision if that decision

6

is contrary to an important and defined public policy. In *United Paperworkers*, the Supreme Court discussed the public policy exception:

> A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine that a court may refuse to enforce contracts that violate law or public policy. . . .
>
> In *W.R. Grace*, we recognized that "a court may not enforce a collective-bargaining agreement that is contrary to public policy". . . . We cautioned, however, that a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."

*Id.* at 42-43 (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983)) (internal citations and quotations omitted). That is, a court may not affirm an arbitral award if to do so would have the effect of enforcing a contract interpretation that is contrary to public policy. The court notes that the Eleventh Circuit, in referring to this public policy exception, stated that "[s]uch a doctrine exists, but examples of arbitration results that so offend public policy that they should be set aside by a court are not readily to be found." *Delta Air Lines, Inc.*, 861 F.2d at 670. With this background in mind, the court reviews the arbitration at issue in this case.

### III. DISCUSSION

In seeking summary judgment in this case, plaintiffs argue that this court should vacate the arbitrator's decision and award because the decision is "contrary to well-established labor policy that employers may not punish union officers more severely than

7

[they] punish[] rank and file employees for their participation in an illegal strike." (Pls.' Br. at 6.) Defendant argues that the arbitrator's decision did not violate public policy because an employer may terminate a union official who instigates or has an active role in a work stoppage. (Def. U.S. Steel Mining Company, LLC's Reply Br. in Supp. of its Mot. for Summ. J. ("Def.'s Reply") at 3-5.) Defendant contends that the undisputed facts show that Tanner instigated and participated in the work stoppage, (Def.'s Reply at 1-2), and that the arbitrator found that USM sufficiently proved Tanner's culpability in the work stoppage, (*Id.* at 2).

A.  **In disciplining employees involved in an unlawful work stoppage, an employer may not discriminate against union officials *vis-a-vis* non-union employees who have acted in the same manner.**

Plaintiffs argue that the arbitration decision, which upheld punishment of a union official that was more severe than the punishment meted out to rank-and-file employees, is "inherently destructive of employees' rights" and thus violates the National Labor Relations Act. (Pls.' Br. at 8-9.) Plaintiffs cite a National Labor Relations Board ("NLRB") holding that "a union official cannot be 'held to a greater degree of responsibility for participating in [a] strike,' because 'discrimination directed against an employee on the basis of his or her holding union office is contrary to the plain meaning of Section 8(a)(3)'" of the National Labor Relations Act. (*Id.* at 9 (quoting *Precision Castings Co.*, 233 N.L.R.B. 183, 184 (1977)).) The Supreme Court has endorsed and affirmed the NLRB's holding in this regard. *See Metro. Edison Co. v. Nat'l Labor Relations Bd.*, 460 U.S. 693, 702-05 (1983).

However, the *Metropolitan Edison* case cited by plaintiffs differs in several important respects from the case at bar. As a matter of procedure, the union officials who were disciplined in that case did not arbitrate their claims, as Tanner did in the instant case. *See* 460 U.S. at 697-98 (recounting case's procedural history). Thus, the narrow standard of review for vacating an arbitral award discussed above is inapplicable. Further, neither of the union officials were found to have taken any leadership role in an unlawful strike. *Id.* at 699. The Court noted this fact and specifically pointed out that it was not addressing the question that is the main issue in the present case:

> *This case does not present the question whether an employer may impose stricter penalties on union officials who take a leadership role in an unlawful strike.* The Administrative Law Judge found that neither [union official] acted as a strike leader. . . . The narrow question presented is whether an employer unilaterally may define the actions a union official is required to take to enforce a no-strike clause and penalize him for his failure to comply.

*Id.* at 699-700 (emphasis added). The joint stipulation of facts submitted in the case at bar indicates that Tanner was discharged for "instigating" the strike. (Doc. 21 ¶ 23.) The Notice of Suspension with intent to discharge informed Tanner of USM's belief that he "supported, condoned, authorized and participated in an unauthorized work stoppage." (*Id.*, Ex. 2.) Because evidence pointed to Tanner's "leadership role in an unlawful strike," the *Metropolitan Edison* case is not determinative of this case.

Defendant points the court to other NLRB rulings in support of the proposition that an employer may discipline union officials when they instigate or lead unlawful work stoppages. For example, in a case where a union steward had urged a work slowdown, the

NLRB found that his employer did not act improperly when it disciplined the steward more harshly than other, non-union employees who were participating in the same activities. *Midwest Precision Castings Co.*, 244 N.L.R.B. 597, 597-98 (1979). The NLRB noted that it "has long held that 'an employee who attempts to persuade fellow employees to strike in violation of a contractual no-strike clause or commit acts of insubordination is not insulated from discipline by the mere fact of his holding union office.'" *Id.* at 598 (quoting *Stop & Shop, Inc.*, 161 N.L.R.B. 75, 79 (1966)); *see also Guy F. Atkinson Co.*, 251 N.L.R.B. 277, 278, 280 (1980) (holding that employer did not act improperly when it refused to re-employ a union steward who had "caus[ed] the [employer's] warehouse employees to engage in a strike," even though all other striking employees had been re-hired).

The rule is thus that an employer may discipline *any* employees who are involved in an unlawful work stoppage, but it may not discriminate against employees who are also union officials solely on the basis of that status when handing out discipline. The cases on which plaintiffs rely are consistent both with this rule and with defendant's cases in support thereof. For instance, plaintiffs rely on *Precision Castings Co.*, 233 N.L.R.B. 183 (1977), for the proposition that it is improper to discriminate against union employees. (Pls.' Br. at 9.) However, that case also states that an employer's "freedom to discipline anyone remain[s] unfettered so long as the criteria employed [are] not union-related." *Precision Castings Co.*, 233 N.L.R.B. at 183. In *Consolidation Coal Co.*, 263 N.L.R.B. 1306 (1982), another case relied on by plaintiffs, (Pls.' Br. at 9), the NLRB specifically stated: "We agree,

of course, that union officials who instigate illegal work stoppages may be singled out for discipline." 263 N.L.R.B. at 1309 n.12.

**B.     The arbitrator concluded Tanner instigated the work stoppage; therefore his decision does not violate public policy.**

Defendant argues that Tanner was suspended for "instigating and participating in a strike," (Def.'s Reply at 2), not for merely skipping work like the other workers. In their affidavits, USM's former general manager and the UMWA district representative both stated that Tanner was fired for instigating a strike. (Doc. 24, Ex. 1, ¶ 7; *id.* Ex. 2, Pasquale Aff. ¶ 12.) Defendant presented its case to the arbitrator on the theory that Tanner had instigated a strike. (Doc. 24, Ex. 2, ex. 6 at 3.) Tanner himself testified that he was fired for "calling" a strike. (Doc. 24, Ex. 4, Tanner Depo. at 118.)

The arbitrator considered the evidence of Tanner's responsibility for the work stoppage. He noted his specific findings of circumstantial evidence that suggested Tanner had instigated or caused at least part of the work stoppage. (Doc. 24, Ex. 2, ex. 6 at 14.) A combination of undisputed facts led the arbitrator to determine that Tanner was influential in leading some or all of the work stoppage. (*Id.* at 14-16.) The court cannot say that that determination had no rational basis.[3] *See IMC-Agrico Co.*, 171 F.3d at 1325 (setting forth standard of review for vacation of an arbitral award). There is no evidence that the arbitrator exceeded the scope of his authority. *Id.* His job was to determine whether Tanner had a

---

[3]As noted above, a court may not reject an arbitrator's findings simply because it disagrees with them.

valid grievance against USM, and he did not attempt to answer any questions irrelevant to that determination. Finally, the decision did not "fail[] to draw its essence from the collective bargaining agreement." *Id.* The arbitrator discussed the burden of proof on an employer who has discharged an employee to show that just cause existed for the employee's discharge. (Doc. 24, Ex. 2, ex. 6 at 12; *see also id.*, Ex. 2, ex. 1, art. XXIV(a) (setting forth burden of proof in discharge review procedure under Wage Agreement).) He then made findings that indicated that the burden of proof had been satisfied. (*Id.*, Ex. 2, ex. 6 at 14-16.)

In sum, the arbitrator decided that Tanner had indeed instigated the work stoppage. Under the law, a union official who instigates an illegal work stoppage "may be singled out for discipline." *Consolidation Coal Co.*, 263 N.L.R.B. at 1309 n.12. Because the arbitrator found that USM did not base its decision on union-related criteria, *Precision Castings Co.*, 233 N.L.R.B. at 183, his decision to allow the discharge to stand did not violate public policy.

## IV. CONCLUSION

Plaintiff did not establish that the arbitration award upholding Tanner's discharge was arbitrary and capricious or materially flawed. The evidence supports defendant's arguments that the CBA granted the arbitrator the right to rule on Tanner's grievance and his findings were not inconsistent with the CBA. In addition, the decision did not violate public policy. Therefore, the court finds that the arbitration award in favor of USM is due to be confirmed, and defendant's motion for summary judgment will be granted. Plaintiffs' motion for summary judgment will be denied. An Order granting defendant's Motion

for Summary Judgment and denying plaintiff's Motion for Summary Judgment will be entered contemporaneously with this Opinion.

    **DONE** this ___30th___ day of September, 2004.

                                                    /s/ Sharon Lovelace Blackburn
                                        **SHARON LOVELACE BLACKBURN**
                                        United States District Judge